LIZA COMPANY, Appellant, v. MARK HELLINGER THEATRE, INC., et al., Respondents.

First Department, July 2, 1963.

*Simon H. Rifkind* of counsel (*Edward N. Costikyan* and *John Lyon* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison*, attorneys), for appellant.

*Bruce A. Hecker* of counsel (*William A. Shea* and *Edwin A. Lewis* with him on the brief; *Manning, Hollinger & Shea*, attorneys), for respondents.

EAGER, J. The action was brought by plaintiff, a limited partnership, engaged in the production of the musical "My Fair Lady", against the defendants, as the owners of the Mark Hellinger Theatre, for certain declaratory judgment and injunctive relief with respect to plaintiff's alleged rights and obligations under an agreement for the use of the theatre for its said production. Following a trial at Special Term, the court directed judgment denying plaintiff the declaratory and injunctive relief demanded, dismissing plaintiff's complaint, and directing judgment for defendants declaring that the plaintiff had breached the theatre agreement, that the run of "My Fair Lady" at defendants' theatre had been validly and lawfully terminated and that the plaintiff vacate and remove itself from the theatre.

Under the agreement for the use of the theatre by the show (hereinafter referred to as the "theatre agreement"), the theatre owner was to receive 25% of the first $50,000 and 15% of the excess of gross receipts of the show in each week, after the deduction of certain expenses. The theatre agreement contained the following provision particularly relevant to the issues, to wit: (a) That "[i]n the event that for any two (2) consecutive weeks the gross box office receipts shall be less than the sum

of Thirty-five thousand dollars ($35,000) per week, then either party hereto shall have the right to terminate the run of the attraction by serving upon the other, a written notice of its election to exercise such rights "; (b) That the attraction " shall advertise only in such papers as are approved by the Manager of this Theatre, it being especially agreed that no billing, distributing or advertising of any kind whatsoever in the newspapers or in any other shape or manner shall be done by the party of the second part without the written consent of the party of the first part or its duly authorized representative, and a violation of this clause shall be considered a violation of the whole contract "; and (c) That the sale of all tickets was to be under the jurisdiction of the theatre and that the prices of tickets " shall be subject to mutual understanding."

" My Fair Lady " opened at the Mark Hellinger Theatre on March 15, 1956 and, concededly, it was one of the most successful productions in theatre history. In the latter part of 1960, however, the receipts for the show began falling off, and plaintiff suggested to defendants that the " stop clause " in the theatre agreement be raised from $35,000 to $42,000 to the end that either party would have the right to terminate the contract if weekly gross receipts fell below $42,000 for two consecutive weeks. The defendants, however, rejected the suggestion to so raise the " stop clause " believing that it was not advantageous to them at that time. Then, in January, 1961, the parties, in order to increase receipts, agreed that plaintiff should distribute " twofers ". These are cards which are on occasions distributed by a show and which provide that a holder turning one in at the box office during certain specified performances is entitled to obtain two tickets for approximately the regular price of one.

Ultimately, there was a dispute between the parties as to whether or not their agreement provided for a time limit for the distribution of " twofers ". In any event, the defendants claim that, in July, 1961, in a conversation between Adler, the general manager of the show, and the defendant Stahl, there was some talk about terminating the distribution of the " twofers " or raising the " stop clause " figure from $35,000 to $42,000. There is a dispute here as to what was said and whether or not the parties did come to any agreement. On August 7, 1961, the defendant corporation entered into an agreement with Richard Rodgers for a letting of the theatre to him for use of his play " No Strings " commencing during the week ending February 22, 1962 or within two weeks subsequent thereto. Thereafter, on September 27, 1961, the defendants by their attorneys wrote to the plaintiff demanding " that the prac-

tice of issuing 'Twofers' be stopped immediately" and that they expected "a reply * * * indicating compliance with the Owner's demands not later than October 2, 1961." Thereupon, on October 2, this action was brought by plaintiff, alleging the dispute between the parties with respect to the right of the show to issue "twofers", and the plaintiff demanded declaratory judgment and injunctive relief with respect to its rights in this connection.

The decision of the trial court that the defendants were entitled to a decree terminating the theatre agreement was based upon the following grounds, viz., *first*, that the "timely decision and notice of the theatre to terminate 'twofers', plus its change of position following Adler's [plaintiff's representative] permission to use his name with the Rodgers organization, acts in equity to estop the plaintiff from remaining in the Hellinger Theatre", and, *second*, that the theatre agreement was subject to termination and terminated by the defendants by reason of plaintiff's breach of the provisions of the theatre agreement in its use of "spot" TV advertisements in January, 1962, without defendants' consent (the pleadings having been amended to include allegations as to such advertising and prayer for relief in connection therewith).

The estoppel on part of plaintiff to claim continuance of the theatre agreement rested upon defendants' claim of the alleged agreement or representations by Adler, that the plaintiff would raise the "stop clause" figure from $35,000 to $42,000 weekly or discontinue, at the end of the 1961 Summer season, the issuance of "twofers". The defendants claim that they "relied on the fact that one or the other would take place" (quote from defendants' brief), and, by reason thereof, committed the use of the theatre effective February 22, 1962 for the production "No Strings". Specifically, the defendants' position is that the refusal of plaintiff to discontinue the use of the "twofers" resulted in keeping the gross receipts of the show barely above the original "stop clause" figure of $35,000 and that such refusal, or, in the alternative, plaintiff's failure to raise the "stop clause" figure operated to prevent defendants from terminating the theatre agreement under the "stop clause".

An agreement between the parties to increase the "stop clause" figure from $35,000 to $42,000 was not, however, established. Significantly, the trial court did not find that such an agreement was actually made and effective. There was some discussion between Adler and defendants looking toward such an agreement, the trial court merely finding, however, that "Adler indicated that he thought Levin [plaintiff's general

partner] would approve the suggestion upon his return from Europe. Upon his return, however, Levin did not approve any change in the ' stop clause ' provision.'' But, clearly, the defendants were not entitled to rely upon the mere proposal for the change where it was never approved and did not ripen into a binding agreement.

During the conversation in July, 1961, concerning the raising of the '' stop clause '' figure, the parties did discuss the possibility of the gross weekly receipts falling below the level of the proposed figure of $42,000 and the consequent vacating of the theatre by the plaintiffs; and in this conversation, there was also a talk about a new musical '' No Strings '' which Richard Rodgers was producing. Adler said he was acquainted with Rodgers' general manager Jacobs, gave Stahl his name and stated that Stahl could use Adler's name as a reference in calling this manager. Assuming, as found by the trial court, that Adler was then envisaging a demise of '' My Fair Lady '' on the raising of the '' stop clause '' figure and that Stahl was then talking about the possibility of interesting Rodgers in the use of the theatre for '' No Strings '' for the next season, nevertheless, the defendants have not shown the basis for an estoppel to support Stahl's contract on August 7, 1961 for use by Richard Rodgers of the theatre. Stahl then well knew that Levin, the general partner, was to have the final say as to whether or not the '' stop clause '' figure was to be raised. It is clear that defendants' commitment to '' No Strings '' was nothing more than a calculated risk voluntarily assumed by defendants with full awareness of the uncertainty of the situation. Adler's permission to Stahl to use his name to get in touch with Rodgers' manager was certainly not intended to and would not operate by way of an estoppel or otherwise to terminate the written theatre agreement.

Furthermore, there is no basis for defendants' claim of estoppel or material breach arising out of plaintiff's alleged refusal to stop issuing '' twofers '' following the 1961 Summer season. We find that there was no agreement between the parties fixing a time limit for the distribution and sale of '' twofers ''. Also, assuming *arguendo* as found by the trial court that the agreement was '' temporary in nature and not intended by either party to be for an indefinite period,'' the defendants nevertheless failed to establish any breach by the plaintiff of such an agreement. The defendants, when they wrote plaintiff on September 27, 1961 giving it notice that they demanded that the practice of issuing '' twofers '' be stopped and demanding a reply by October 2, 1961, were not claiming a

breach of or a right to terminate the theatre agreement. Then, on October 2, 1961, the plaintiff started this action alleging the dispute between the parties with respect to the right to distribute " twofers ". Thereupon, most significantly, on October 10, 1961, the parties expressly entered into a stipulation in writing whereby, pending trial of the action and decision rendered thereon, the defendants were to continue to honor the " twofers ". So, the continuance of the distribution of " twofers " by the plaintiff following the notice by the defendants was consented to by the defendants subject to a determination of the rights of the parties by the court.

The defendants' letter of September 27, 1961, constitutes most cogent evidence refuting their claim of estoppel. They had contracted on August 7, 1961, to lease the Hellinger Theatre to Rodgers. Yet, as late as September 27, 1961, they were recognizing the theatre agreement with plaintiff as fully effective and binding. They made no claim in their letter of said date that they had a right to terminate the agreement. Nor did they therein make any claim that the " stop clause " figure should be raised to $42,000. They were merely then demanding " that the practice of issuing ' Twofers ' be stopped immediately " and that they expected " a reply  *  *  *  indicating compliance with the Owner's demands not later than October 2, 1961." So, it is clear that their claim of estoppel was merely an afterthought.

Finally, there is no proper support for the second ground of the Trial Judge's determination for the defendants, namely, his conclusion that the defendants had the right to terminate and did duly terminate the theatre agreement because of plaintiff's alleged violation of the advertising clause. In this connection, the allegations of defendants' amended answer were that the plaintiff, without consent, had caused certain " spot " advertisements of the show to be run on TV during 10 days or more in or about January, 1962. The fact is, however, that theretofore, from the day the show opened and for nearly six years, the plaintiff had continually used many forms of advertising, including TV advertising, without consent or protest from the defendants. It is true that, as aforesaid, the advertising clause provided that " a violation of this clause shall be considered a violation of the whole contract ", and that the defendants could have insisted upon full compliance by the plaintiff with the advertising clause, but they never did so. The letter of September 27 was not a notification by defendants that they were insisting upon compliance with such clause as respects advertising generally. Such letter was directed solely to the demand for discontinuance of the use of " twofers " insofar as

it constituted advertising. The defendants must be deemed to have waived the right to claim, without notice, an abrogation of the contract by ordinary advertising.

Moreover, on the record here, it appears that, prior to the time the defendants were claiming a breach by the plaintiff of the advertising clause in the theatre agreement, the defendants themselves had broken and were repudiating the contract. They were in charge of the sale of tickets at the box office and were bound by their agreement to continue the sale in the usual course as long as the show remained in the theatre. But they admit (by their answer) that they had issued instructions to their box office personnel not to sell tickets for performances scheduled after February 24, 1962. As early as December, 1961 they had stopped the sale of tickets for all such performances and, in any event, on January 11, 1962, plaintiff's attorneys wrote to defendants complaining of their violation of the theatre agreement in this connection and stating that the defendants would be held responsible for such violation. Significantly, it was not until the receipt of said letter that the defendants, by their letter of January 15, formally notified plaintiff of their alleged election to terminate the theatre agreement for the advertising breach. This made it necessary for the defendants to take the position that their determination to stop the sale of the tickets for performances beyond February 24, 1962 was made, not because of any alleged breaches by the plaintiff of the advertising clause, but because of their commitment already made to allow "No Strings" to use the theatre as of February 22, 1962. This had been defendants' position right along and the last-minute adopting by them of the alleged advertising clause breach as a ground for termination of the theatre agreement does not appear to have been in good faith. They had already determined to end the theatre agreement, and the claim of the advertising breach was also a mere afterthought seized upon by them in an effort to justify a position which they had already assumed.

In any event, if as demonstrated aforesaid, there was no material breach of the theatre agreement or estoppel on plaintiff's part prior to the defendants' commitment in August, 1961, to "No Strings", then, the defendants' said material breach in connection with ticket sales should preclude it from claiming a forfeiture of the agreement for plaintiff's alleged later breach of the advertising clause. Moreover, the breach by plaintiff of the advertising clause, if any, was of such a minor and technical nature that, under the circumstances, it should not have been given the effect of abrogating the agreement.

Clearly, in view of the foregoing, the judgment for the defendants is not supported. The plaintiff, in compliance with the judgment herein, did vacate and remove its show from the defendants' theatre, but, inasmuch as there remains undetermined the rights of the parties with respect to alleged damages on account of alleged breaches of the theatre agreement and certain issues having a bearing thereon were fully litigated, the issues are not academic and there should be a declaration in connection therewith. Under the circumstances, the plaintiff is entitled to judgment declaring that the plaintiff's continuance in the sale of " twofers " up to and including the time of the trial was not in breach of any agreement of the parties; declaring that the written " stop clause " provision was not modified by any agreement of the parties to increase the " stop clause " figure to $42,000; declaring that the defendants were not entitled to terminate the theatre agreement because of the alleged television advertising in January, 1962; declaring that the defendants were not entitled to terminate the theatre agreement or to a removal of the plaintiff's show from the premises; and dismissing defendants' counterclaims.

Findings of fact contained in the decision at Special Term which may be inconsistent herewith should be reversed, and new findings of fact made as indicated herein. Thereupon, the judgment of the trial court should be reversed, with judgment for plaintiff as herein directed, with costs.

McNALLY, J. (dissenting). It was patently impractical to continue with the production of " My Fair Lady " at the defendants' theatre unless the defendants were required to honor the " twofers " until the oral arrangement therefor was mutually terminated. Plaintiff's Exhibit 4 shows the receipts resulting from " twofers " for the period February 11 to September 28, 1961 totaled $318,295.09 and plaintiff's Exhibit No. 6 sets forth a net profit of $117,927 for the year 1961. The conclusion is irresistible that without the aid of " twofers " the show would have sustained a substantial loss during 1961. In addition, the said arrangement enabled plaintiff to comply with the stop clause which provided for termination of the lease by either party in the event gross receipts fell below $35,000 for two consecutive weeks.

The trial court found the oral arrangement for the " twofers " to be temporary and that it was duly terminated in September, 1961. This critical finding is grounded solely on the resolution of an issue of credibility and should not be disturbed by this court which has not had the advantage of hearing and observing

the witnesses as to the oral arrangement. (*Amend* v. *Hurley,* 293 N. Y. 587, 594; *Smith* v. *Smith,* 273 N. Y. 380, 383; *York Mtge. Corp.* v. *Clotar Constr. Corp.,* 254 N. Y. 128, 134; *Boyd* v. *Boyd,* 252 N. Y. 422, 429.)

Accordingly, I dissent and vote to affirm the judgment.

RABIN, J. P., and STEUER, J., concur with EAGER, J.; McNALLY, J., dissents in opinion in which STEVENS, J., concurs.

Judgment reversed with judgment for plaintiff as directed in opinion by EAGER, J., with costs to appellant. Findings of fact contained in the decision at Special Term which may be inconsistent with the opinion by EAGER, J., are reversed and new findings of fact are made as indicated in said opinion. Settle order on notice.