In re AIR VECTORS ASSOCIATES, a
Partnership, Debtor.

AIR VECTORS ASSOCIATES, a
Partnership, Plaintiff

v.

NEW YORK STATE DEPARTMENT
OF TRANSPORTATION, Defendant.

Bankruptcy No. 82–30346.
Adv. No. 84–7117.

United States Bankruptcy Court,
S.D. New York.

Sept. 30, 1985.

Sherman, Citron & Karasik, P.C., New York City, for debtor-plaintiff; A. Mitchell Greene, of counsel.

Duggan, Crotty & Dunn, P.C., New Windsor, N.Y., Special Trial Counsel to debtor-plaintiff; Bruce Dunn, of counsel.

Rogers & Wells, New York City, for defendant; John M. Quitmeyer, of counsel.

## DECISION ON COMPLAINT SEEKING DECLARATORY JUDGMENT

JEREMIAH E. BERK, Bankruptcy Judge.

This is an adversary proceeding commenced by Air Vectors Associates, a Chapter 11 limited partnership (hereinafter "AVA" or "debtor" or "plaintiff"), pursuant to Federal Rules of Bankruptcy Procedure ("FRBP") 7001(2) and 7001(9) for a declaratory judgment of the debtor's right to renew a lease agreement, dated May 15, 1978, between itself as lessee and the New York State Department of Transportation (hereinafter "DOT" or "defendant") as lessor by assignment.

The instant proceeding is the latest product of the debtor's long and tortuous existence in bankruptcy. In an effort to set this matter in proper perspective, a procedural history of the case and the events leading up to debtor's request for declaratory relief follows.

## I. *Procedural Background*

On June 7, 1982, the debtor filed its petition for reorganization under Chapter 11 of the Bankruptcy Code ("Code"), 11 U.S.C. § 1101 *et seq.* Since this date, AVA has been operating its business as a debtor in possession in accordance with Section 1108 of the Code. Owing to nominal creditor interest in the case among those general unsecured creditors eligible to serve, no official creditors' committee was appointed.

The debtor's business consists of providing various aviation services as a fixed-based operator at the site of the leased premises which is Stewart International Airport ("Stewart") located at Newburgh, New York. The services that the debtor renders are specified in the lease and they form, in part, the basis for the present litigation.

After protracted hearings on the debtor's disclosure statements, this court on August 10, 1984 approved the debtor's revised second amended disclosure statement and fixed October 11, 1984 as the date for the confirmation hearing. Prior thereto, the DOT, an unsecured creditor and lessor of the debtor, filed its objection to confirmation. One of the bases for this objection was the debtor's alleged inability to pay certain pre-petition rents which the DOT claimed would have to be paid as a prerequisite to the debtor's intended assumption of the lease under its proposed plan of reorganization. Another basis of DOT's objection to the debtor's confirmation concerned the question of whether or not the debtor was the same entity that signed the original lease on May 15, 1978.

As both the debtor's plan and disclosure statement are predicated on the debtor's ability to assume its lease, the hearing on confirmation did not go forward on October 11, 1984, pending the resolution of the DOT's objection. The debtor has to this date not progressed any further towards confirmation.

In an attempt to resolve the DOT's objection concerning the lease assumption issue, AVA filed a motion pursuant to Section 365 of the Code to determine its right to as-

sume the lease. Substantive hearings on the motion were held on October 11 and 30, 1984 and December 17, 1984.

The October 11, 1984 hearing primarily concerned the issue of whether or not the lessee which signed the lease on May 15, 1978 was the same entity as the debtor in possession. In so finding that the debtor was the same entity, this court specifically noted that there was no "determination as to whether or not there was in fact a default under the lease." Transcript at 109 (Oct. 30, 1984) (Transcript hereinafter "Tr.").

At the hearing held October 30, 1984, it became apparent that another preliminary issue would have to be determined before the assumption matter could be resolved. This issue, concerning the debtor's right to renew the lease for an additional five-year term, only evolved as such at this time because of two occurrences. First, the DOT on October 25, 1984 notified AVA that it had rejected the debtor's request to exercise the renewal option as provided in the lease. Second, the lease, unless renewed, was due to expire on December 31, 1984.

During the hearing on October 30, 1984, the debtor's attorney attempted to make an oral motion for a declaratory judgment on the debtor's right to renew the lease. Tr. at 11–12 (Oct. 30, 1984). As this request for relief was neither noticed to any interested party nor presented in the proper procedural form, the oral motion on the issue of renewal was not entertained. The debtor's effort in this regard did, however, identify another issue that would have to be resolved prior to confirmation, namely the debtor's right to renew the lease.

Coupled with the importance of determining the renewal issue as a prerequisite to confirmation was the apparent urgency of the renewal issue. The debtor's original tenancy was due to expire in 60 days. Thus, as a practical matter the renewal question had to be decided as a threshold issue prior to the determination of the assumption issue. And, even if AVA was permitted to assume the lease and cure the various outstanding monetary defaults, all the debtor would have received in return would have been two months of operations at Stewart pursuant to the remaining term of the lease. Tr. at 19–20 (Oct. 30, 1984).

Notwithstanding the procedural requirements of bankruptcy law, the debtor's attorney filed a motion for a declaratory judgment on the renewal issue on November 26, 1984. Opposition papers were filed by the DOT. At the hearing held on this motion on December 17, 1984, the proper posture for the relief requested concerning the renewal issue was clarified. The debtor subsequently filed its complaint pursuant to FRBP 7001(2) and 7001(9) on December 20, 1984 for a declaratory judgment of the debtor's right to renew the lease between itself and the DOT.

To facilitate the parties' efforts and avoid duplication of the testimony taken at the evidentiary hearing held on December 17, 1984, this court with the consent of the debtor and the DOT deemed this testimony to constitute part of the five-day trial that was commenced on January 4, 1985 on the debtor's complaint. Tr. at 6–10 (Jan. 4, 1985).

After the plaintiff completed its case, the DOT on January 21, 1985 moved for summary judgment pursuant to Federal Rules of Civil Procedure ("FRCP") 56 and FRBP 7056. In support of its motion and in compliance with Rule 3(g) of the Civil Rules for the U.S. District Court for the Southern District of New York, the movant-DOT submitted a statement of the material facts to which the respondent-debtor agreed contained the correct and undisputed facts. Tr. at 46–47 (Jan. 21, 1985). In denying the motion for summary judgment, this court found respondent's argument "that interpretation of the lease regarding default and renewal requires the court to examine issues of fact concerning the meaning of certain lease provisions" to be persuasive. Tr. at 15 (Feb. 26, 1985).

At the last day of trial, the court was informed that "meaningful" settlement negotiations had commenced and a "possible resolution" of the matter was at hand. Tr.

at 3, 8 (Mar. 29, 1985). Thus, following the trial's conclusion, a series of post-trial conferences were held into the summer of this year during which the parties reported on their various good-faith, though ultimately unproductive, negotiations. When further attempts to settle proved fruitless, the parties notified the court that the matter was fully submitted and this decision was necessary.

This court also notes that, while this request for declaratory relief was *sub judice,* one of the debtor's largest unsecured creditors brought a motion to convert the Chapter 11 case to a Chapter 7 case. Evidentiary hearings have been held and adjourned on the conversion motion.

## II. *The Issues*

In its complaint, the debtor alleges it has "performed the agreements [of the lease] and has been in compliance with the terms and conditions of its lease" and thus has the right to renew the lease for the additional five-year period pursuant to section 19(b) of the lease.

The DOT, in its defense, alleges that the debtor has failed to render due performance under the contract and has not complied with its terms. The DOT's argument is based principally on the following: (1) the debtor's failure to conduct a "first class fixed-base operation" pursuant to the terms of the lease, and (2) the debtor's pre-petition nonpayment of rent due under the lease.

The issues, thus presented, are whether or not the debtor has duly performed and complied with the lease's requirements for a "first class fixed-base operation" and whether or not the debtor's pre-petition monetary default is a bar to its exercise of the lease's renewal option. As this court finds that the debtor has substantially failed to conduct a "first class fixed-base operation" as required by the lease, this opinion therefore does not address the monetary default issue.

## III. *The Lease and the Debtor's Performance—Findings of Fact*

### A. *The Lease*

#### 1. *Its origins*

The lease agreement, a comprehensive 36-page typewritten document, was entered into by AVA and the Metropolitan Transportation Authority (hereinafter "MTA"), the DOT's predecessor in interest, on May 15, 1978. Plaintiff's Exhibit 1. The lease is not a standard "form" lease. As testified to by the president of the debtor's managing partner, James O. Aspin, the lease was a product of extensive negotiation between himself personally, on behalf of AVA, and the MTA. Tr. at 83–87 (Mar. 29, 1985).

One example of Aspin's personal involvement in these negotiations was his incorporation of a certain leasehold improvement provision favorable to AVA's right to extend the lease. Aspin stated, "I represented that there needed to be an economic level of activity to justify this investment." *Id.* at 87. Aspin testified that this provision was included to "allow Air Vectors Associates to extend its lease an additional five years" if AVA made "a minimum leasehold improvement of $250,000." *Id.*

This extension provision is contained in section 19(b) of the lease which is also the section that defines the debtor's renewal option. Section 19(b) provides in relevant part:

Lessee shall have the option to renew the term hereof for two additional consecutive periods of five years each and, should Lessee make capital in-place improvements ... of an aggregate cost of at least $250,000 during the initial term hereof, a further consecutive period of five years. All the terms and conditions of this Lease shall be applicable during any such renewal term. Lessee may exercise any such option to renew only if Lessee has duly performed the agreements and has been in compliance with the terms and conditions herein set forth....

Plaintiff's Exhibit 1 at 25.

In addition to negotiating the lease, Aspin testified that he made an inspection of the leased premises prior to signing the lease. Tr. at 122 (Mar. 29, 1985). He also affirmed that he had read the lease before signing it on behalf of the lessee-to-be, AVA. Tr. at 36 (Dec. 17, 1984). Thus, Aspin's role in the derivation of the lease cannot be characterized as that of a mere signatory to the lease. Prior to executing the lease, he had investigated the conditions of the leased premises, actively participated in the negotiations for the lease, assisted in the origination of some of the terms contained within the lease's renewal clause, and then read the lease before signing it on May 15, 1978.

Aspin, as noted earlier, is the president of the debtor's principal managing partner, Air Vectors Stewart, Inc. In recognition of his integral role in the management of the leased premises, the lease was drawn to make specific reference to Aspin's expertise and personal responsibility for the execution of the lessee's duties under the lease. The lease, in fact, acknowledges that Aspin's involvement with the lessee prompted the MTA, in part, to enter into the lease with AVA. The lease states:

> *Management*—One of the inducements which has caused MTA to enter into this Lease is the business acumen, FBO [fixed base operator] operational experience and management capability of James Aspin. . . . Lessee shall cause . . . [Mr.] Aspin to be assigned to the management of the FBO facility at [Stewart] Airport and . . . [he] shall [not] be replaced without the prior written concurrence of MTA. Plaintiff's Exhibit 1 at 36.

It can thus be concluded that Aspin was not only cognizant of the terms of the lease and negotiated the inclusion of some of them into the lease, but was personally responsible for assuring that the lessee performed those terms in compliance with the lease from its very inception.

The other principal signatory to the lease was the MTA as lessor. The MTA was the debtor's landlord for approximately four years after the lease commenced on July 15, 1978. Tr. at 30 (Mar. 14, 1985); Plaintiff's Exhibit 1 at 25. During April of 1983, the DOT assumed the ownership and management of Stewart and thereby became the assignee of all of the MTA's rights and obligations under the lease pursuant to Section 400 of the New York Transportation Law. Tr. at 93 (Mar. 29, 1985).

Whereas, the DOT's underlying authority to assume the lease as a lessor with AVA is provided for in Section 400(2) of the New York Transportation Law, the statute also specifically mandates how the DOT is to operate Stewart. Section 400(1) states:

> In order to meet present and future state needs with respect to the provision of *adequate, safe and efficient air transportation facilities and services* to the public, and to promote the economic development and well-being of the state, the planning, development, maintenance and operation of such facilities and services at Stewart . . . may be carried out by the [DOT]. . . . N.Y.Transp.L. § 400(1) (McKinney 1984) (emphasis added).

Therefore, pursuant to the not uncertain directive of Section 400(1), the DOT is statutorily obligated to assure that the maintenance and operation of Stewart are "adequate, safe and efficient."

### 2. *The leased premises*

The leased premises are situated at Stewart International Airport, a "major regional airport facility" located in the Mid-Hudson area of New York State. Tr. at 132 (Feb. 26, 1985). Geographically, Stewart encompasses nearly 10,000 acres with an aeronautical area of approximately 1,600 acres. Tr. at 95 (Mar. 14, 1985). The airport's future plans include the construction of an 8,000-acre industrial complex on an undeveloped portion of the property. *Id.* at 96.

Stewart has one of the longest runways on the east coast and, technically, it can readily accommodate a space shuttle return flight, as well as such large aircraft as the Boeing 747 and Lockheed C–5A. Tr. at 133

(Feb. 26, 1985). The airport's main runway, measuring 11,818 feet in length, has a fully instrumented landing system with runway visual range capacity. *Id.* at 132–33.

Originally built during World War II, Stewart was initially utilized by the U.S. Army and then was employed as a U.S. Air Force base. Tr. at 21 (Mar. 14, 1985); Tr. at 81 (Mar. 29, 1985). Stewart still serves as a base for detachments of the U.S. Army and the New York Air National Guard, which currently is the largest aviation tenant at Stewart. Tr. at 86 (Dec. 17, 1984).

Presently, however, Stewart now serves both military and civilian interests. Its services include the provision of cargo and passenger charter operations and occasionally scheduled flight services. Tr. at 132–33 (Feb. 26, 1985). In addition, several corporate concerns utilize Stewart as an aviation base. These entities hangar their aircraft at Stewart, rent office space and utilize Stewart's facilities and services. *Id.* at 80.

During bad weather conditions or for other emergencies, Stewart plays a vital role as a diversionary airport for the three major metropolitan airports located in the region of New York City. *Id.* at 133–34. On one recent occasion, Stewart accommodated 14 major diversions during a snowstorm. *Id.* at 145–46; Tr. at 37 (Mar. 14, 1985).

Pursuant to the terms of the lease, AVA has access to the entire airport because of the services it has to perform under the lease. Plaintiff's Exhibit 1 at 1–2. The debtor, however, specifically leases three hangars identified as "A," "B" and "C," certain fuel storage areas, and a terminal, designated as Building 140, which is a 8,000 square foot facility that serves as the debtor's administrative base of operations. Tr. at 162 (Feb. 26, 1985); Tr. at 31 (Mar. 14, 1985).

AVA, in turn, subleases the hangars to various corporate entities, collects these rents and pays the DOT a percentage based on the amount collected. AVA sub-leases its hangar facilities to H–O Penn Machinery, Tr. at 78 (Feb. 26, 1985), and Ottaway Newspapers. Tr. at 139 (Dec. 17, 1984).

### 3. DOT's rejection of AVA's exercise of its renewal option

Originally, the initial term of the lease was to have expired on July 15, 1983. The DOT, however, gave the debtor an additional 18-month extension on the lease's original term to compensate the debtor for the construction and renovation of the airport's major runway. Tr. at 125–26 (Mar. 29, 1985). As a result, the lease as amended expired on December 31, 1984.

In accordance with section 19(b) of the lease, the debtor on June 26, 1984 timely notified the DOT of its intent to exercise its renewal option for an additional five-year period. Plaintiff's Exhibit 6. On October 25, 1984, the DOT sent its letter which rejected the debtor's request for a five-year renewal term. The letter stated the following as the basis for the DOT's decision:

> Our detailed operational review indicates that *Air Vectors has continued to experience financial difficulties, is unable to provide capital for improvements and a stable operation, provides ineffective supervision and control over its employees and has generally failed to provide a first class operation.* For these reasons, and other's [sic] detailed in the presentations to the Bankruptcy Court, the Department has determined that Air Vectors has not performed nor complied with the terms and conditions of the Lease Agreement. Therefore, the Department rejects Air Vectors request for a five (5) year renewal term. Defendant's Exhibit M (emphasis added).

### 4. The lease terms

The only ground alleged for the denial of the debtor's renewal option that is pertinent here concerns the debtor's asserted failure "to provide a first class operation" as required in the lease. *Id.* The lease's only reference to this requirement is con-

tained in the first section of the lease. This section might very well be described as the "heart" of the lease. The lease's preamble, for example, describes the importance of section one in the following:

WITNESSETH: That MTA does hereby lease to Lessee, and Lessee does hereby take and hire from MTA, for the term at the rentals, and upon the covenants, conditions, limitations and agreements contained in this agreement, and *for the purpose of conducting the aviation activities specified in Section 1 hereof and for no other purpose whatsoever.* Plaintiff's Exhibit 1 at 1 (emphasis added).

Section one of the lease, entitled "Activities to be Conducted by Lessee," is divided into two subsections. Subsection "A" details the mandatory services that the lessee must perform while subsection "B" explains the discretionary services to be supplied by the debtor. Subsection "A" begins:

A. Lessee *shall diligently and continuously conduct a first class fixed-base operation* ("FBO") upon the leased premises and, to the extent necessary, upon MTA-retained premises (as specifically provided below), consisting of the provision of the following supplies and services.... *Id.* at 3 (emphasis added).

What follows this subsection is a detailed breakdown of 18 categories of services that the lessee is obligated to perform under the lease. These services include staffing and managing a general aviation terminal (Sec. 1.A. (a)); meeting and directing all aircraft arriving at Stewart (Sec. 1.A.(b)); providing courtesy transportation for air carrier crews and passengers (Sec. 1.A.(c)); parking and tying down certain types of aircraft (Sec. 1.A.(d)); storing aircraft inside hangars and providing "in-out" hangar service (Sec. 1.A.(e)); providing arrival and departure services for all aircraft utilizing the airport (Sec. 1.A.(f)); repairing general aviation aircraft (Sec. 1.A.(g)); the sale and safe delivery of fuel to aviation users (Sec. 1.A.(h)); providing aircraft ground support and various communication services (Sec.

1.A.(i, l, m, n)); and furnishing of trained, uniformed operating personnel "together with such equipment, tools and fixtures as may be required to provide the supplies and services enumerated above ..." (Sec. 1.A.(r)). *Id.* at 3–6.

Although the provision of the above enumerated services is mandatory, the lease does give the lessee an option to elect not to provide certain services if an economic hardship can be demonstrated. Specifically, the lease provides that the lessee may "suspend the provision of any of the foregoing supplies and services should Lessee demonstrate to the satisfaction of MTA that it is not economically feasible to provide same." *Id.* at 6. No testimony or evidence was offered by the plaintiff that the debtor at any time exercised this provision regarding the services it is required to supply as a fixed-base operator.

It should be realized that although the lease is subdivided into a total of 32 sections, it states that the section headings are "for convenience and reference only" and further notes that the subdivisions "in no way define or limit or describe the scope or intent hereof or in any way affect this Lease." *Id.* at 35. The lease itself, therefore, requires that it be construed as an integrated document.

Consequently, another provision of the lease is relevant to the issue at hand. Section seven, labeled "Sales and Services," contains the *raison d'etre* of the lease. This section states in part:

(a) The *principal purpose* of MTA in making this Lease is to make available at the Airport the services and supplies which Lessee is required or authorized to provide hereunder. Lessee shall furnish such supplies and services promptly, courteously, safely, and efficiently and shall use its best efforts in every proper manner and in accordance with the provisions hereof to develop and increase revenues derived therefrom. *Id.* at 15 (emphasis added).

This section declares the importance of the lessee's role as a service provider at Stewart and, in recognition of this significant

role, mandates the standards of how those services are to be provided.

Another relevant section sets forth the lessee's maintenance and housekeeping obligations. Section eight provides in part:

(a) Lessee shall at all times keep all parts of the leased premises, including facilities and improvements hereinafter made by the Lessee, in a *clean and orderly condition and appearance and provide at its own cost and expense all those regular preventive maintenance services required* by those parts of the leased premises consisting of buildings and other structures, their equipment and appurtenances (including ramp, tie-down and other paved areas), in order to prevent same from deteriorating. *Id.* at 16 (emphasis added).

Although the term "first class fixed-base operation" appears only in section one of the lease which is the portion of the lease that identifies the tenant's mandatory responsibilities, testimony was proffered by both the DOT and AVA that this term related to the performance of virtually all of the lessee's obligations. For example, Aspin, on behalf of AVA, stated, "I believe I felt that it [the lease's reference to "first class fixed-base operation"] was a preliminary statement of which the rest of the lease reflected what was meant by a fixed base operation." Tr. at 38 (Dec. 17, 1984). He also characterized the term as a "preamble to the other terms and conditions" of the lease. *Id.* at 39–40. Aspin did note, however, that the term was inapplicable to the lessee's financial obligations under the lease. *Id.* at 46.

Aspin described how "first class fixed-base operation" applies to the lease's specific provisions in the following excerpts taken from his cross-examination:

Q. Does first class, Mr. Aspin, does that denote safe operation?

A. Certainly.

Q. And does it mean, does it denote having trained personnel?

A. Yes.

Q. Does it denote having clean and presentable personnel?

\* \* \* \* \* \*

A. Well, certainly personnel who would have contact with the general public, yes.

Q. What did you mean by general public, Mr. Aspin?

A. Customers.

\* \* \* \* \* \*

Q. Would first class service mean giving prompt service?

A. Yes, to the extent practical.

\* \* \* \* \* \*

Q. Now, Mr. Aspin, does a first class operation mean one that maintains its buildings?

A. It depends. It—certainly you maintain your buildings.

\* \* \* \* \* \*

Q. Mr. Aspin, does a first class fixed base operator monitor the radio frequencies for incoming airplanes requesting airport services?

A. Sure.

Q. Does a first class fixed base operator keep the bathrooms for which it is responsible clean and in good repair?

A. Yes, clean, you know, keep them clean, yes.

\* \* \* \* \* \*

Q. Does a first class fixed base operator, Mr. Aspin, provide service which prompts people to want to use Stewart Airport?

\* \* \* \* \* \*

A. Yes.

*Id.* at 46–56.

Initially, the plaintiff attempted to prove that Aspin was unsure of the definition of "first class fixed-base operation" as set forth in the lease. Aspin stated that the lease offered "no further explanation" of the term and that he requested a definition of it from the DOT "through correspondence with Mr. [James P.] McGuinness,"

the airport director at Stewart. *Id.* at 27. Aspin stated that he received no response from the DOT to his inquiry. *Id.* at 28.

The plaintiff, however, offered no proof beyond Aspin's rather vague recollection that he requested a definition of the term "first class fixed-base operator." In contrast, McGuinness emphatically testified that he never received an inquiry from anyone at AVA concerning the term's definition. Tr. at 129–30 (Feb. 26, 1985).

Aspin himself testified that he not only read the lease's first section containing the term "first class fixed-base operation," but had no questions about its meaning when he signed the document. Tr. at 37–38 (Dec. 17, 1984). Even during the trial, Aspin demonstrated no hesitancy in defining the term. For instance, he declared that it meant "providing certainly things in at least sufficient enough service to satisfy its [AVA's] customers." *Id.* at 44.

Furthermore, there was documentary evidence that Aspin had himself used the term "first class" in a license agreement drawn by the debtor. Aspin testified that he participated in the preparation of the document and signed it on behalf of AVA. *Id.* at 41. In granting a food concessionaire the right to operate at the airport, the license agreement stipulated that the "[l]icensee will provide and maintain all equipment necessary to conduct a *first class* snack bar offering fresh food." Defendant's Exhibit A at 2 (emphasis added).

Finally, the court also notes that in addition to the DOT's "Rejection of Lease Renewal" which specifically cited the debtor's failure "to provide a first class operation" (Debtor's Exhibit M), Aspin also received three separate notices of default on three separate occasions each of which referred to the debtor's responsibility under the lease to conduct a first class fixed-base operation. Debtor's Exhibits B, C, and D.

The testimony on the behalf of the DOT concurred with Aspin's definition of the term "first class fixed-base operation." James P. McGuinness, the airport director of Stewart and a DOT employee, testified that the term "is later defined in the lease." Tr. at 129 (Feb. 26, 1985); Tr. at 53 (Mar. 14, 1985). He elaborated, "the lease terms get into the staffing, the services, the manner in which services are to be provided, the facilities that are to be operated, so that the lease itself contains a definition of first class." Tr. at 129 (Feb. 26, 1985). McGuinness also testified that no one at AVA asked him for a further definition of the term. *Id.* at 129–30.

■ It thus appears that neither Aspin, nor McGuinness, for the DOT, demonstrated any confusion as to the meaning of the term "first class fixed-base operation" as it is used in the lease. Aspin testified that he had read the lease before signing it, he had no questions concerning the meaning of "first class" in the lease and that he had even signed a licensing agreement which itself utilized similar language and, both Aspin and McGuinness testified that the lease itself defined the meaning of "first class fixed-base operation." There consequently appears to be no basis to find that the lease's reference to the term "first class fixed-base operation" is ambiguous. The court also notes that the AVA did not raise any issue of ambiguity in its pleadings nor trial regarding the interpretation of this term.

### B. *AVA's performance under the lease*

As noted earlier, the debtor's option to renew the lease for an additional five-year term is contained in section 19(b) of the lease. This option is not unconditional. The conditions as stated in the lease are that the lessee "may exercise any such option to renew *only* if Lessee has duly performed the agreements and has been in compliance with the terms and conditions herein set forth ...." Plaintiff's Exhibit 1 at 25 (emphasis added). Aspin also testified that it was his understanding that the debtor could exercise its option to renew "provided the terms and conditions of the lease are in compliance." Tr. at 20 (Dec. 17, 1984).

As the principal grounds for rejecting AVA's exercise of its renewal option, the

DOT cited the debtor's failure to pay certain pre- and post-petition debts to the DOT and the debtor's failure to conduct a first class fixed-base operation. Defendant's Exhibit M. That part of the lease which discusses the debtor's rent obligations is section 20. The performance obligations are contained in sections one and eight which enumerate the services that the lessee must provide and in section seven which describes the manner in which they should be provided.

The plaintiff-debtor in its principal case alleged that it had complied with all the lease's performance terms based on the testimony of its only witness on this matter, Aspin. Concerning the pre-petition monetary default, Aspin asserted that the debtor was prepared to cure the monetary default. Tr. at 21, 61 (Dec. 17, 1984). Regarding the performance issue, Aspin testified as follows:

Q. Mr. Aspin, absent the pre-petition monetary defaults, has the debtor defaulted in any other condition or covenant of its lease, the Debtor's Exhibit 1?

A. We have received notice of defaults which we believe have been cured.

*Id.* at 25–26.

Aspin later elaborated on this response. He stated that AVA had "made every effort to correct any defaults that we [AVA] have felt were true and correct and justified." *Id.* at 27. In response to the question as to whether or not the debtor has conducted a first class fixed-base operation at Stewart, Aspin replied, "I believe in the context of this particular airport, yes." *Id.* at 29.

The DOT, in its defense, countered Aspin's testimony with that of McGuinness, the airport director at Stewart, the chief safety officer for the airport and several users of the facilities at Stewart. The demeanor and testimony of these witnesses were credible and convincing. The witnesses, citing numerous specific incidents, testified as to the debtor's performance shortcomings in virtually every service requirement of the lease.

Claiming that it did not anticipate the scope of the defendant's case and, perhaps, in an enlightened recognition of its burden of proof, the debtor moved to submit rebuttal witnesses at the close of defendant's case. Tr. at 51–52 (Mar. 15, 1985). The debtor, in rebuttal, sought to counterpoise the defendant's case again through the testimony of Aspin and certain users of the airport. The debtor's application was granted and rebuttal as well as surrebuttal testimony was taken. *Id.* at 87.

The essence of the issue here is the standard of the debtor's performance under the lease since the inception of the debtor's tenancy in May of 1978. The lease specifically mandates that the lessee shall "*continuously* conduct a first class fixed-base operation." Plaintiff's Exhibit 1 at 3 (emphasis added).

The inherent difficulty in evaluating the debtor's performance on an ongoing basis, however, is the intrinsic changeableness of the level of performance of services that must be rendered, given varying conditions and levels of demand. Services that are required to be performed over a period of time must be viewed in a temporal context which recognizes the normal highs and lows of performance even over the course of a single day. The debtor itself made this argument. Tr. at 88 (Dec. 17, 1984). This court, therefore, searched the record for those performance indicia that reflected a failure to perform that went beyond mere variation from the required performance standards. The search yielded four areas where the debtor has neither duly performed the required services nor complied with the terms and conditions of the lease.

The court, in reaching this conclusion, found as relevant not only the reoccurrence of the nonperformance or continued lack of cure, but the debtor's awareness of its nonperformance in each of these four areas. The debtor was so informed through formal default notices prepared by the DOT pursuant to section 12 of the lease and by informal notices of deficiency. Tr. at 52–53 (Mar. 14, 1985). As McGuinness explained,

the purpose of these notices was to inform the debtor that the DOT was not satisfied with the debtor's performance and to encourage some improvement. Tr. at 168–69 (Feb. 26, 1985). Representatives of the DOT also met with AVA personnel concerning the debtor's performance under the lease two to three times per month. Tr. at 58 (Mar. 14, 1985); Tr. at 169 (Feb. 26, 1985). The testimony at trial also revealed that the debtor was apprised of its lack of performance in these four areas through complaints made by several users of the services it provided. And, the testimony generated by the trial itself put the debtor on notice of its performance failures, yet the failures persisted.

### 1. *Safety*

Perhaps the debtor's most serious performance failure under the lease presented by the evidence at trial has been its inability to provide services in a safe manner. The evidence in this regard not only emanated from a DOT employee, but also from a representative from the military, a tenant of AVA, the chief safety officer at Stewart and even from admissions by Aspin himself.

There are two sections of the lease that obligate the lessee to provide services in a safe manner. One concerns the sale and delivery of fuel by the lessee to Stewart's aviation users. Specifically, the lessee must "have available sufficient refueling vehicles safely to dispense fuel as required to meet such demands." Plaintiff's Exhibit 1 at 4.

The second reference to safety in the lease is contained in section seven. This part of the lease prescribes: "Lessee shall furnish such supplies and services promptly, courteously, safely, and efficiently...." *Id.* at 15. Aspin also unequivocally testified that the lease's requirement that the lessee function as a "first class" fixed-base operator denoted that debtor "[c]ertainly" provide a safe operation. Tr. at 46 (Dec. 17, 1984).

The list of AVA's unsafe practices both concerning its fueling operations and its

procedures in general is extensive. Aspin, referring to a complaint by Purolator Courier, acknowledged that the spray painting of an automobile by AVA personnel inside a hangar created a respiratory and fire safety problem. Tr. at 58–59 (Dec. 17, 1984). Although Aspin stated "immediate action" was taken "to terminate the painting or any other hazardous activity," *id.* at 94, AVA's action was apparently taken in response to the complaint and not on its own initiative. Aspin also testified that it was the "unsafe handling" of a forklift vehicle by an employee of the debtor which caused a toxic chemical spill of insecticide at the airport. *Id.* at 60. Again, although the employee was dismissed for causing the accident, Aspin stated that the employee had had a "prior record with us which also showed that he had been suspended for previously misusing equipment." *Id.*

Concerning AVA's fueling practices, two witnesses testified that they were unsafe. For example, Major Gary Drackett, Commander of the Second Aviation Detachment of the Army at Stewart stated that the debtor's fueling service could not be characterized as safe. Tr. at 36 (Feb. 26, 1985). A seasoned pilot who is responsible for seven aircraft stationed at Stewart, *id.* at 18, Drackett noted in particular, that AVA's refueling procedures and equipment are unsafe. *Id.* at 28–30. Similarly, Kevin Gilligan, also a pilot, testified that, based on his personal observations, AVA's fueling operations are "[s]ometimes unsafe". *Id.* at 83–84. Gilligan, the chief pilot of H–O Penn Machinery which is a tenant of AVA at Stewart, noted that ten times out of 100, AVA's personnel failed to ground the fueling procedure. *Id.* at 109. This observation was not questioned by the debtor. Gilligan, like Drackett, said he could not characterize AVA's fueling practices as safe. *Id.* at 100.

Regarding AVA's safety performance in general, McGuinness, the airport director, related several incidents of unsafe practices that he had personally observed on the night of January 24, 1984 during which 14 flight diversions were handled at Stewart.

*Id.* at 145–46; Tr. at 41–42 (Mar. 14, 1985). He recounted that on that evening AVA was operating a fuel truck without any headlights and using other fuel vehicles that had only one functioning headlight. He also saw vehicles operated by AVA personnel proceeding at unsafe speeds. Tr. at 34–35 (Mar. 14, 1985).

As a result of these safety violations, McGuinness prepared his first default notice to the debtor on February 8, 1984. Defendant's Exhibit B; Tr. at 34 (Mar. 14, 1985). This notice stated that the debtor was in violation of the lease's requirement that it conduct a "first class fixed-base operation." The letter then itemized McGuinness' observations and also incorporated those of the airport's chief safety officer. The debtor's response, though timely, did not question the truth or validity of McGuinness' recitation of the safety violations he observed. Plaintiff's Exhibit 5.

The airport's Chief Safety Officer, Arnold Messer, also testified that AVA's practices were generally unsafe. As part of his job at Stewart, Messer prepares accident reports, Tr. at 144 (Mar. 14, 1985), and is responsible for monitoring the safety standards of fueling operations, vehicle traffic and buildings. *Id.* at 130.

Regarding the safety violations that occurred on the evening of January 24, 1984, Messer, like McGuinness, witnessed fuel trucks operated by AVA personnel that did not have functioning headlights and were driven by AVA personnel at unsafe speeds. *Id.* at 153–55. He also stated that he observed "[m]any occasions" of a safety violation wherein refueling procedures had been started but no stairs were in place at the passenger exits of airliners being refueled. *Id.* at 215. He accordingly ordered AVA personnel to have the stairs set up for the passengers. *Id.* In addition, Messer observed three separate instances of refueling vehicles that were hooked up to aircraft with no AVA personnel in attendance. *Id.* at 153–55, 210, 212. These incidents involved a Scandanavian DC–10, Pan American 747 and a Regent Air 727. *Id.*

Aspin, in a letter dated February 17, 1984 that was addressed to McGuinness, admitted that the three "incidents involving unattended fuel vehicles" did occur. He also conceded that the incidents were of a "serious nature" and were a "violation of safety standards." Plaintiff's Exhibit 5 at 2.

It should be noted that Messer's recollection of these incidents was quite clear, notwithstanding that 14 months had elapsed since their occurrence. This can be attributed to the fact that he caused a report on the various safety violations he witnessed to be prepared on January 26, 1984, two days after they occurred. Defendant's Exhibit X.

On the plaintiff's rebuttal case, Gary Luback, an AVA employee, was called primarily to contradict Messer's testimony regarding the diversion incidents that occurred on January 24, 1984. Luback's testimony itself, however, contained contradictions. Initially, Luback testified that he saw the refueling operation of every passenger plane that evening. Tr. at 41–42 (Mar. 29, 1985). Later, however, Luback stated that he "was not able to observe every one of them," for the refueling operations were, in some cases, going on simultaneously. *Id.* at 66. Luback claimed, nevertheless, that no refueling operation was accomplished without stairs in place, *id.* at 42, and that he did not see any refueling operation during which fuel was being pumped while the plane was unattended. *Id.* at 41. This statement, of course, contradicts Aspin's admission in his letter of February 17, 1984 that there were three instances in which refueling operations were unattended. Plaintiff's Exhibit 5 at 5.

The plaintiff also had its insurance broker testify regarding the debtor's safety performance. The broker, John Cantril, claimed that AVA "has an excellent insurance record." Tr. at 137 (Mar. 15, 1985). In support of this observation, he cited the debtor's competitive premiums based on its claim experience. *Id.* at 133. His testimony, however, did not relate to nor contra-

dict the safety violations described by the defendant.

Similarly, the testimony of Major Victor Horton, another of the plaintiff's rebuttal witnesses, failed to contradict the defendant's safety violation claims. Although Major Horton, the department commander for maintenance of the 105th Military Airlift Group at Stewart, did state that AVA's fuel delivery services were safe, he is not a pilot and does not "deal personally with them [AVA's personnel]." *Id.* at 118. It would thus appear that his exposure to AVA's practices is limited and, as a result, his estimation of their practices is given limited import.

■ In summary, the defendant brought out in its defense significant and numerous instances of unsafe practices by the plaintiff in violation of sections one and seven of the lease. The plaintiff, accordingly, did not prove that it provides services in a safe manner as required by the lease.

### 2. *Cleanliness*

Section eight of the lease provides in relevant part: "(a) Lessee shall at all times keep all parts of the leased premises, including facilities and improvements hereinafter made by the Lessee, in a clean and orderly condition...." Plaintiff's Exhibit 1 at 16. Aspin testified that a first class fixed-base operator "certainly" maintains its buildings and facilities, such as bathrooms. Tr. at 52, 55 (Dec. 17, 1984).

The evidence regarding the debtor's failure to maintain the leased premises was not limited to just singular isolated violations, but portrayed a series of continuing incidents that persisted even through the pendency of the trial. AVA's housekeeping performance under the lease was aptly summarized by McGuinness as "woefully deficient." Tr. at 166 (Feb. 26, 1985).

The most disturbingly evident fact throughout the testimony presented by the defendant was the reoccurrence of the various housekeeping problems, particularly, of the hangar facilities, A, B, and C, which are within the leased premises. Notwithstanding the fact that AVA had been notified of its housekeeping shortcomings on several occasions and from several sources, any improvement in AVA's performance was ultimately followed by regression back to the prior standards. *Id.* at pp. 165–166.

The hangars are occupied by several tenants who pay rent to AVA for the use of the facilities. Ottaway Newspapers, a month-to-month tenant, hangars its seven million dollar plane at hangar A. Tr. at 123–24, 127 (Dec. 17, 1984). AVA supplies Ottaway primarily with fueling and hangaring services. *Id.* at 127. The other tenant is H–O Penn Machinery to which AVA supplies hangar storage facilities for its corporate aircraft worth $700,000, office space and fueling services. Tr. at 77–80 (Feb. 26, 1985).

On February 13, 1984, the debtor received a letter of default from the DOT concerning AVA's "poor housekeeping and operational practices" regarding hangar A. Defendant's Exhibit C. The default notice made reference to correspondence from Daniel Carroll, chief pilot for Ottaway, which was attached to the DOT's default notice. Carroll's letter, dated February 6, 1984, noted that the hangar A facilities "have progressively deteriorated to an intolerable level" and characterized the hangar as a "pig pen from a cleanliness" point of view. *Id.*

In his response to the default notice as stated in a letter addressed to McGuinness dated February 24, 1984, Aspin admitted that "[i]t is true that we have had our ups and downs on cleaning." Plaintiff's Exhibit 5. Aspin then went on to state that he has "always taken action when it was brought to [his] attention...." *Id.*

Aspin also testified that he had received complaints from the two principal tenants of hangar A, Ottaway Newspapers and H–O Penn Machinery, regarding the "cleanliness of the facility." Tr. at 59 (Dec. 17, 1984). Kevin Gilligan, chief pilot for H–O Penn said that he has complained about the cleanliness of the hangar to Aspin during 1984 and since the beginning of 1985. Tr. at 96 (Feb. 26, 1985).

Despite all this prior notice, AVA's housekeeping performance continued to be delinquent even during the trial. Daniel Carroll, chief pilot for Ottaway Newspapers, for example, testified that one reason he never allows passengers to board or depart from his company's executive plane at hangar A was because the "physical appearance of the storage facility is unacceptable." Tr. at 134 (Dec. 17, 1984). He noted that the floor is "dirty" and the "transient bathrooms are inadequate." *Id.* at 140.

Gilligan described the present condition of his hangar facilities as "a mess." Tr. at 91 (Feb. 26, 1985). He observed that "[t]he toilet facilities are very dirty," the "hangar floor is very dirty with oil and water," and the "[g]arbage cans are all full and overflowing most of the time." *Id.* Although these observations had been previously communicated to AVA personnel during 1984, by Gilligan, *id.* at 91–92, 112–14, the conditions he described existed at the time of his testimony in February of 1985. *Id.* at 91–92, 114–15. Despite his complaints to AVA, Gilligan asserted that there had been no improvement notwithstanding the fact the uncleanliness is caused "[p]rimarily by Air Vectors personnel." *Id.* at 114. In fact, Gilligan testified that he has himself "[c]leaned the toilets," "washed the floor," "[s]crubbed the sink" and "brought paper towels in." *Id.* at 115.

McGuiness' testimony corroborated the negative descriptions of the hangar facilities presented by Gilligan and Carroll. Pursuant to a walk-through inspection of the hangars he conducted the day before his testimony on February 26, 1985, McGuinness reported there was "oil strewn across the floor" of hangar C and there "were barrels of lubrication oil, uncapped, with oily rags laying on top" located inside the building. *Id.* at 164. In hangar B, the trash barrels were "full almost to the point of overflowing" and its "restrooms were a disgrace." *Id.* He gave the following description:

One faucet leaked continually; the basins were dirty, smeared with both grease and rust and wear. There were panels of the wall paneling that were broken through. One of the toilet areas had no privacy door on it, obviously [it] had fallen off and just been taken away and not replaced. There was dirt and grime wherever you looked.

*Id.* at 165.

It is interesting to note that these observations were made almost exactly one year after AVA first received a default notice from the DOT concerning the debtor's lack of housekeeping of the hangar facilities. Defendant's Exhibit C. As McGuinness lamented, "It's gotten absolutely no better." *Id.* at 173.

At the next trial date on March 14, 1985, McGuinness again testified regarding the cleanliness of the hangars pursuant to another walk-through inspection he conducted on the previous day of the same facilities. Tr. at 103–06 (Mar. 14, 1985). Although nearly a month had elapsed since he reported the results of his first inspection of the premises, the results of the second inspection showed little improvement. The floor in hangar C was still "far from being clean." *Id.* at 103. He observed barrels filled with oil in the immediate proximity of eight batteries and a "pile of metal just thrown there." *Id.* at 103–04. The oily rags on top of the barrels filled with lubricating oil "were still there." *Id.* at 104. A "gross stench" emanated from the employee restroom facilities. The toilet facilities continued to be inoperable. In hangar B "basically the same conditions existed." The housekeeping of hangar A's restrooms had improved, but was "still below a standard" that McGuinness considered satisfactory. *Id.*

The debtor did not present any witness which substantively challenged the defendant's allegations concerning the cleanliness of the hangars, except for Aspin. Yet, even he admitted that at least some of the deficiencies McGuinness reported on March 14, 1985 did exist. Aspin claimed that on his own walk-through inspection of hangar A he "did not find some of the deficiencies he [McGuinness] alleged." Tr. at 100 (Mar.

29, 1985). No further delineation was made in challenge to McGuinness' observations. In fact, Aspin testified that it was through the testimony of the witnesses at this trial that he learned of claims of poor housekeeping. *Id.* at 96.

McGuinness noted that the debtor's housekeeping performance was cyclical whereby an acceptable level of cleanliness would be reached and then it would "fall right back down again." Tr. at 173 (Feb. 26, 1985). As previously observed, Aspin himself admitted that AVA had its "ups and downs" in its housekeeping performance. Plaintiff's Exhibit 5. This court notes, however, that the lease mandates that the lessee provide its services "continuously." Plaintiff's Exhibit 1 at 3.

On the last day of trial, Aspin discussed his response to the DOT's original notice of default, dated February 13, 1984. Defendant's Exhibit C. He stated that AVA *"would* undertake a cleaning routine that *would* be responsive to their needs and be closely coordinated with their chief of maintenance." Tr. at 102–03 (Mar. 29, 1985) (emphasis added). Yet these efforts, if undertaken, apparently never achieved the resolution of the cleanliness problem which still existed more than a year later. This recurrent lack of performance violates section eight of the lease. The plaintiff, thus, did not prove that it met the cleanliness standards established by the lease.

### 3. *Repair and preventative maintenance*

Section eight of the lease also requires the lessee to keep the leased premises in good repair and to undertake preventative maintenance measures. Plaintiff's Exhibit 1 at 16–19. Aspin testified that the performance of these requirements is indeed the responsibility of a first class fixed-base operation. Tr. at 52, 55 (Dec. 17, 1984).

No witnesses were presented by the plaintiff to rebut the extensive testimony proffered by the defendant as to the leased premises' state of disrepair. Some testimony from Aspin on behalf of the debtor was adduced indicating that Stewart as well as the leased premises were in a "sad state" of disrepair at the time when he, on behalf of AVA, signed the lease in May of 1978. Tr. at 82 (Mar. 29, 1985). Aspin testified that the hangars, three of which are contained within the leased premises, as constructed by the Air Force in 1943 were designated as temporary structures only. This fact was cited by Aspin as having contributed to the degenerated condition of the facilities. *Id.* at 81–82.

Aspin, however, also testified that he had inspected the premises before signing the lease and that he knew what he was getting into. *Id.* at 121–22. In apparent recognition of the amount of repair work and consequent economic investment that AVA would have to undertake as a lessee, Aspin, for example, negotiated the inclusion of a capital investment leasehold improvement minimum which would, if achieved by AVA, entitle it to extend the lease an additional five years. *Id.* at 86–87. Notwithstanding the leased premises' initial poor state of repair, AVA in signing the lease nevertheless became bound by its terms which provide that the lessee "accepts the leased premises and leased equipment *'as is.'"* Plaintiff's Exhibit 1 at 3 (emphasis added). AVA thereby also became obligated to make those needed repairs and to take preventative maintenance measures.

McGuinness was the principal witness to testify regarding the debtor's alleged failure to make the necessary repairs of the leased premises. Most of this testimony concerned the three hangars situated within the leasehold. Beginning with hangar C, he noted, it was "obvious that the building has not been maintained." In support of this statement, he cited the existence of a "fairly substantial leak" in the hangar, and the extensive presence of broken windowpanes. Tr. at 163–64 (Feb. 26, 1985). Repairs were also needed for the hangar's fuse box. Tr. at 104–05 (Mar. 14, 1985). In hangar B, the restrooms were not operational and there were windows with broken glass or no glass at all. Tr. at 164 (Feb.

26, 1985). Similarly, the restrooms in hangar C were not operational. Tr. at 105 (Mar. 14, 1985). In addition, the hangar doors have not been maintained, weatherstripping was missing and their bottom panels had begun to rot. All three hangars required painting. *Id.*

■ As noted earlier, McGuinness' testimony as to the repairs needed at the leased premises was not controverted by the plaintiff. As these repairs are required to be performed by section eight of the lease, the debtor consequently has violated this lease provision by failing to perform these necessary repairs. The plaintiff, as a result, did not prove that it made the repairs and performed the preventative maintenance as required by the lease.

### 4. *Prompt Service*

Section seven of the lease states that the "principal purpose" of the lessor in making the lease is "to make available at the Airport the services and supplies" that the lessee is required to provide. The section then states how the lessee "shall furnish" these supplies. One of these mandatory requirements is that the lessee shall furnish the services "promptly." Plaintiff's Exhibit 1 at 15. When asked if "first class service" meant "giving prompt service," Aspin answered, "Yes, to the extent practical." Tr. at 47 (Dec. 17, 1984). Aspin later elaborated that this meant giving prompt service "[u]nder the circumstances, the circumstances being the minimum demand of the airport." *Id.* at 52.

In support of its contention that it provided prompt service, the debtor had admitted into evidence several notices of commendation. One was a letter from the Federal Aviation Administration which commended AVA for its repair of an airplane belonging to an inspector. Plaintiff's Exhibit 3. Another was a certificate of appreciation from an officer of the West Point Military Academy for the debtor's assistance in organizing an airlift of the institution's cadets. Plaintiff's Exhibit 4. Both of these commendations concern, however, out-of-the-ordinary events and the

latter was for an event for which AVA had between one and two months to prepare. Tr. at 118–19 (Dec. 17, 1984).

Three witnesses testified that AVA's service was not prompt. Dan Carroll, the chief pilot for Ottaway Newspapers, said AVA's response time for his fueling service requests is inadequate on occasion. *Id.* at 131. As examples of this inadequacy, he recalled that sometimes the requests for fuel have to be repeated up to three times before AVA would respond. *Id.* He explained another example:

> ... calling in on the radio with no response at all and then after landing, walking in and requesting fuel and still not getting fuel due to various reasons. That is what I consider inadequate. *Id.* at 132.

He also testified that on two occasions he had to wait up to five hours for his plane to be fueled. *Id.* at 166.

Carroll stated that he personally complains at least once a month to AVA regarding a fueling service problem. *Id.* at 169–70. As the primary reason for the delay, Carroll recalled that AVA has explained that "it was the lack of personnel at the proper time of my arrival or call." *Id.* at 132.

Noting that AVA's performance is "[m]arginal at best," *id.* at 145, Carroll also cited AVA's failure to respond at all to hangaring his seven million dollar aircraft. He estimated that during 1984 the plane was left outside overnight between 12 and 20 times out of 100 flights. The reason why the plane was not hangared was because none of the three AVA personnel designated to move the plane were available. *Id.* at 157–60.

Major Gary Drackett, a pilot and the commander of the Second Aviation Detachment of the U.S. Army at Stewart, said he could not characterize AVA's delivery of its fueling services as "prompt," Tr. at 36 (Feb. 26, 1985), and that he has personally complained to AVA's personnel regarding its delayed fueling response time. *Id.* at 51–52. Although the Second Aviation De-

tachment has a "readiness" mission, occasionally he noted there have been instances where the waiting time was up to four hours for a plane to be refueled. "We have had cases," Drackett stated, "where we have actually had to put the aircraft in the hangar without fuel in them." *Id.* at 23. The longest waiting period was a day and a half. *Id.*

Kevin Gilligan, chief pilot for H–O Penn, testifying concerning the timeliness of AVA's response to his fuel requests, stated that the debtor's performance was "very sporadic." *Id.* at 81–82. Between 15 and 20 per cent of the time, H–O Penn must hangar its own plane, according to Gilligan, even though it is AVA's responsibility to do this. *Id.* at 87. He, too, would not characterize AVA's performance as "prompt." *Id.* at 100.

The plaintiff, in its rebuttal case, called two witnesses to testify regarding the promptness of AVA's delivery of the services required under the lease. Both witnesses were members of the New York Air National Guard which is Stewart's largest tenant in terms of personnel. Tr. at 86 (Dec. 17, 1984). Of the two, however, only one was a pilot and thus had day-to-day contact with AVA's performance and response time. Tr. at 123 (Mar. 15, 1985).

Colonel John Fenimore, an executive officer and director of operations for the New York Air National Guard, noted that AVA principally supplies his group with fueling services only. He said that AVA "compared favorably with the larger FBO's [fixed-based operators] that I came into contact with and as well or better than the majority of the ones at small airports." *Id.* at 125. Fenimore did recall, however, that he has never used AVA's facilities in a non-official capacity. *Id.* at 126.

Fenimore's testimony was terse. He did not specifically testify as to whether or not the debtor's fueling services were prompt. Perhaps this could be implied from his statement that AVA "compared favorably" with other fixed base operators. In contrast, however, the three credible witnesses for the defendant testified directly on the issue of the promptness of the debtor's performance and cited specific, uncontroverted examples of the debtor's lack of promptness in delivering certain required services. Accordingly, this court is more persuaded by their testimony than by that given by Fenimore.

■ Thus, in light of the evidence presented, the plaintiff failed to prove that it promptly furnished the services as required under the lease.

## IV. Conclusions of Law

### A. Applicable Law

■ This adversary proceeding, brought pursuant to FRBP 7001(2) and 7001(9), is for a declaratory judgment of the plaintiff-debtor's right to renew its lease for an additional five-year term. In a declaratory judgment, it is a "general rule of law," that the plaintiff must sustain the burden of proof and thereby "bear the risk of nonpersuasion of his prima facie case." 6A *Moore's Federal Practice* ¶ 57.31[1] at 57–283 (1984). *Reliance Life Insurance Co. v. Burgess*, 112 F.2d 234, 238 (8th Cir.) ("It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action."), *cert. denied*, 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453, *reh'g denied*, 311 U.S. 730, 61 S.Ct. 391, 85 L.Ed. 475 (1940).

■ "Declarative relief," it has been observed, "consists simply in a court's defining the rights and duties of the parties in a particular legal context." J. Cound, J. Friedenthal & A. Miller, *Civil Procedure Cases and Materials* 19 (2d ed. 1974). The debtor's rights here arise out of a lease, the construction of which is typically a matter of state law. The leasehold interests, however, arise out of a bankruptcy estate and thus must also be construed under bankruptcy law. Thus, both bankruptcy and state law apply to the determination of this declaratory judgment action.

### 1. *Bankruptcy Law*

#### a. *Property of the Estate*

 Section 541(a)(1) of the Code provides that "property of the estate" consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." There is "no dispute," as a result, that a debtor's possessory interest in a valid leasehold constitutes "property of the estate" under § 541(a)(1) of the Code and is thereby entitled to the protections afforded to all property of the estate provided by the bankruptcy laws. *In re KDT Industries, Inc.*, 32 B.R. 852, 856 (Bankr.S. D.N.Y.1983); *In re Maxwell*, 40 B.R. 231 (N.D.Ill.1984).

The Code, however, does not address the question of what constitutes a legal or equitable interest in property. Although the lease, which is the subject of the instant litigation, expired on December 31, 1984, the debtor-lessee remains in possession in a holdover status pursuant to a stipulation it entered into with the DOT after the lease's expiration. The only "interest" the debtor has is its alleged right to exercise its renewal option under the law.

Until recently, the bankruptcy courts have broadly interpreted "property of the estate" as it applied to the interests of a debtor in a lease. *See, e.g., In re Lewis*, 15 B.R. 643, 8 BCD 528 (Bankr.E.D.Pa.1981); *In re Andora Meat Market, Inc.*, 7 B.R. 744 (Bankr.E.D.Pa.1980). With the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, however, a new limitation on the inclusion of a leasehold interest as property of the estate was enunciated in § 541(b) of the Code for nonresidential leases. The bankruptcy courts have, accordingly, applied this exception. *See, e.g., In re Flexipak, Inc.*, 49 B.R. 641 (Bankr.S.D.N.Y.1985); *In re Dascoli's, Inc.*, 49 B.R. 519 (Bankr.E.D. Pa.1985).

 Section 541(b)(2) thus provides:
(b) Property of the estate does not include—
 (2) any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case.

This court, however, finds that the lease in question here is property of the estate subject to the jurisdiction of the bankruptcy court. Even though the lease expired on December 31, 1984 and is a "lease of nonresidential real property," it is the purpose of this decision to determine only whether or not the debtor has a right to renew the term of the lease for an additional five-year period.

#### b. *Equity Considerations*

Whether in a bankruptcy context or not, a leasehold interest can be an "enormously valuable asset." *In re Sapolin Paints, Inc.*, 5 B.R. 412, 418, 6 BCD 776, 2 C.B.C.2d 854 (Bankr.E.D.N.Y.1980). Especially in an era of general inflation and high building replacement costs, a debtor's business "may be destroyed or at least seriously impaired" if a debtor must surrender its lease. Simpson, *Leases and the Bankruptcy Code: The Protean Concept of Adequate Assurance of Future Performance*, 56 Am.Bankr.L.J. 233 (1982).

As noted earlier, the debtor in possession is a fixed base operator which derives its income and, hence, its existence from its lease with the DOT. This lease is the debtor's only lease, from which it derives its only source of income. The crux of and "indeed the viability" of this Chapter 11 case depend upon the continued existence of the lease." *In re Player's Pub, Inc.*, 45 B.R. 387, 388, Bankr.L.Rep. ¶ 70,200 at 86,-321 (Bankr.D.Mass.1985).

 This court is mindful of the fact that a Chapter 11 debtor should be given every opportunity afforded it under the bankruptcy laws to take advantage of the "optimum environment for rehabilitation" without unnecessary interruption of its

business. B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 8.11[1] at 8–23 (1980).

Yet, the protections of the bankruptcy laws are not without limit. Although the automatic stay protects the "naked right of possession" it has no bearing on the lease's continued viability. *Matter of R.R.S., Inc.*, 7 B.R. 870, 872, Bankr. L.Rep. (CCH) ¶ 67,805 at 78,542 (Bankr.M. D.Fla.1980). *See also In re Darwin*, 22 B.R. 259, 6 C.B.C.2d 1245 (Bankr.E.D.N.Y. 1982). Nor, can the bankruptcy court rewrite the terms of a lease. *Matter of Lauderdale Motorcar Corp.*, 35 B.R. 544, 548–49, 11 BCD 517, Bankr.L.Rep. ¶ 69,502 at 83, 791 (Bankr.S.D.Fla.1983) ("However great this Court's powers are to preserve a debtor's property interest, this Court cannot enlarge or increase the Debtor's property or rewrite the terms of a contract."); Bordewieck, *The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract*, 59 Am.Bankr.L.J. 197, 202 (1985) ("The Bankruptcy Code simply does not authorize the bankruptcy court to extend a contract beyond its stated terms if the debtor would not otherwise have possessed the right to do so.").

The bankruptcy courts do have guidance in balancing these competing considerations. "Fortunately," as Judge Bonney has observed, "we possess what other courts do not have a lot of—equity." *In re Gray*, 49 B.R. 540, 545 (Bankr.E.D.Va. 1985). Indeed, the bankruptcy courts are "primarily" courts of equity. *Id.* *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197, 201 (1966); *Katchen v. Landy*, 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966).

Again, however, even as tribunals of equity, the bankruptcy courts are not unfettered in their actions and must operate within certain bounds. As applied to the determination of the rights and responsibilities of the respective parties to a lease, it has been noted:

> While it is recognized that within the context of reorganization this Court has the equitable power to modify lease provisions if it would benefit the estate and not significantly prejudice the lessor (cites omitted), equity will not countenance the debtor's [attempt] . . . to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy.

*Matter of Easthampton Sand & Gravel Co.*, 25 B.R. 193, 7 C.B.C.2d 903, 908 (Bankr.E.D.N.Y.1982); *See also Matter of D.H. Overmeyer Co.*, 12 B.R. 777, 793 (Bankr.S.D.N.Y.1981), *aff'd*, 30 B.R. 823 (S.D.N.Y.1983).

Finally, this court is guided by the principle enunciated by Judge Schwartzberg that "bankruptcy courts as courts of equity, should look with disfavor on contract forfeitures, especially if a forfeiture would imperil a debtor's reorganization efforts." *In re Photo Promotion Associates, Inc.*, 45 B.R. 878, 882 (Bankr.S.D.N.Y. 1985). *See also In re Allen A. Resort, Inc.*, 38 B.R. 663, 665 (Bankr.D.N.H.1984) ("Courts of equity abhor forfeitures and require strict proof to trigger the same."). As Judge Paskay noted:

> The purpose of a Chapter 11 reorganization is to revive and preserve a viable business enterprise if possible, especially where it is in the best interest of the creditors. Therefore, when faced with a question of lease termination, the Court must consider the interests of the debtor and its creditors as well as those of the landlord (cite omitted). Therefore, where continuation of the lease would not overly prejudice the landlord and where enforcement of a forfeiture provision would frustrate or impair a Chapter 11 plan, relief has been granted by the bankruptcy courts.

*Matter of Cordaro*, 20 B.R. 814, 816 (Bankr.M.D.Fla.1982).

Although at issue here is at most an executory contract right of the debtor to renew its lease, it does represent something of value to the debtor and its possible reorganization. Equity principles thus apply to the right to renew a lease. *See, e.g.,*

*Matter of Opus One, Inc.,* 33 B.R. 190, 194 (Bankr.W.D.Pa.1983).

Notwithstanding this court's sensitivity to the "universally accepted proposition of jurisprudence that 'equity does not favor any forfeiture,'" it is also aware of the principle that "where ... the intention to create a conditional estate is clear from the terms of the lease agreement, we are counseled that equity 'does not license judicial eradication of rights ... clearly vested by the contracting parties as part of their bargain.'" *Matter of D.H. Overmeyer Co.,* 12 B.R. at 793 *quoting Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 844 (2d Cir.1975). Indeed, this court must strike a *balance of equities* in its interpretation of the law as it applies to the rights of both the debtor and the lessor as well as the creditors.

### 2. *New York Law*

The lease here represents property interests that are "created and defined by state law" and thus "should not be analyzed any differently in a bankruptcy proceeding." *In re Intermet Realty Partnership,* 26 B.R. 383, 387 (Bankr.E.D.Pa.1983). *See In re Players' Pub, Inc.,* 45 B.R. at 391 ("[R]esort must be had to state law to determine the extent of the debtor's interest in the lease."); *cf. Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Lloyd,* 18 B.R. 624, 8 BCD 1094 (Bankr.E.D.Pa.1982). The parties to the lease themselves covenanted that the lease "shall be governed by and construed in accordance with the laws of the State of New York." Plaintiff's Exhibit 1 at 35. This court will therefore look to the substantive rules of construction under New York law to interpret the respective rights and obligations of the parties to the lease.

### B. *Construction of the lease under New York Law*

A lease agreement is "like any other contract" and as such the basic precepts of contract law apply to lease construction. *Farrell Lines, Inc. v. City of New York,* 30 N.Y.2d 76, 82, 330 N.Y.S.2d 358, 362, 281 N.E.2d 162, 166 (1972); 33 N.Y.Jur. *Landlord and Tenant* § 76 at 377 (1964). One "fundamental maxim of contract construction" that is particularly applicable to the interpretation of a lease is that the lease "must be construed according to the expressed intent of the parties." *In re Evelyn Byrnes, Inc.,* 32 B.R. 825, 831, 9 C.B. C.2d 430 (Bankr.S.D.N.Y.1983), *citing Frank B. Hall & Co. v. Orient Overseas Associates,* 65 A.D.2d 424, 411 N.Y.S.2d 233 (1978) *aff'd,* 48 N.Y.2d 958, 425 N.Y. S.2d 66, 401 N.E.2d 189 (1979).

Under New York Law, interpretation of a lease is a question a law for the court. 33 N.Y.Jur., *supra* at 378. The court, however, is bound to render a "fair and reasonable interpretation" based on the parties' intent to the extent that it can be discerned from the language of that lease. *Farrell Lines, Inc.,* 30 N.Y.2d at 82, 330 N.Y.S.2d at 362, 281 N.E.2d at 166; 33 N.Y.Jur. *supra* at 379. As one court noted, "We cannot rewrite an agreement entered into between knowledgeable parties and effect a result in the derogation of its express terms." *Bayside Federal Savings & Loan Association v. Cord Meyer Development Co.,* 28 A.D.2d 866, 281 N.Y.S.2d 893, 895 (2d Dep't), *aff'd,* 20 N.Y.2d 822, 284 N.Y. S.2d 711, 231 N.E.2d 296 (1967). The rationale of this rule was explained by the New York Court of Appeals in the following:

> A lease agreement, like any other contract, essentially involves a bargained-for exchange between the parties. Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party.

*Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 67–68, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566 (1978).

A corollary of these familiar legal principles is that to the extent that the intent of the parties is expressed in the lease, then this intent will control and "resort may not

be had to extrinsic evidence of the intentions or acts of the parties." *Reltron Corp. v. Voxakis Enterprises, Inc.,* 57 A.D.2d 134, 395 N.Y.S.2d 276, 280 (4th Dep't 1977). Judge Learned Hand described the application of this rule of construction:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

*Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911).

The "something else" alluded to by Judge Hand likely refers to the presence of an ambiguity in a lease's provisions. Thus, the first matter that should be addressed here is whether or not the lease agreement between the debtor and the DOT contains any ambiguous references which would therefore require this court to use extrinsic evidence to interpret the contract.

Based on the pleadings, the lease agreement itself and the testimony at trial, this court finds that the lease is unambiguous in defining the rights and obligations of the respective parties. Although at the trial, the debtor did attempt to question the meaning of "first class fixed-base operator," the overwhelming weight of the evidence showed that neither party seriously had any problem with interpreting the meaning of this phrase. Indeed, both parties testified that the phrase was defined by the terms of the lease itself. Aspin himself negotiated the lease on behalf of AVA as well as read its terms before signing it. Although he testified that he requested in writing a definition of the phrase from the DOT, no letter was produced and no one at the DOT recalled either an oral or written request for a clarification of the term.

Other courts have also examined the meaning of "first class" used in the context of a lease and similarly found the term to be unambiguous. For example, in *Mutual Life Insurance Co. v. Tailored Woman, Inc.,* 309 N.Y. 248, 128 N.E.2d 401 (1955) the lease, which was the subject of the controversy, required the tenant to have its store " 'at all times contain a stock of first class merchandise.' " 309 N.Y. at 251–52, 128 N.E.2d at 402. The Court of Appeals found that this term was "verbiage" could "be read with the purpose clause" of the lease which prescribed the types of apparel and accessories to be sold by the lessee. *Mutual Life Insurance Co.,* 309 N.Y. at 252, 128 N.E.2d at 402. *See also Baumert v. Malkin,* 235 N.Y. 115, 139 N.E. 210, 211 (1923) (deed's restrictive covenant requiring the erection of "first-class" residential buildings on the premises).

Where no guidance is provided by the lease on the meaning of its terms, the terms can be found to be ambiguous. For instance, the bankruptcy court, in *In re Evelyn Byrnes, Inc., supra,* was confronted with a lease that required the tenant-debtor to conduct its business in a " 'high caliber' " manner and to maintain the premises " 'in a manner consistent with the high standards of the building.' " *Id.* at 827. Applying New York law, the court found that these terms were "sufficiently ambiguous" in the way they were used in the lease and that they lacked the "precision necessary to determine" whether or not there had been a breach of these terms by the debtor. *Id.* at 832. The court did note a distinction between these terms and "a roughly equivalent term" such as " 'first class,' " the latter of which "might not be ambiguous." *Id.* at 832 n. 10. In the instant matter, however, the lease's utilization of the term "first class" is clear within the context of the lease itself and the parties have so testified.

The New York Court of Appeals has observed that where a lease was "evidently prepared by a careful and experi-

enced draftsman" and that it was " 'drawn technically in form, and with obvious attention to details ...,' " there is "no room for implication." *Bruce v. Fulton National Bank,* 79 N.Y. 154, 161–62 (1879). Such was the evidence presented at trial. The lease was a product of extensive negotiation. Its length and content indicate that the document was also drawn with close attention to detail. Thus, in the absence of any ambiguity in the lease agreement between the debtor and the DOT, this court must give "all the words and phrases used in the lease their plain meaning" to determine the parties' rights. *Martin v. Glenzan Associates, Inc.,* 75 A.D.2d 660, 426 N.Y.S.2d 347, 348 (3d Dep't 1980).

Another general precept that guides this court in interpreting the rights and obligations created by the lease is the tendency by New York courts to disfavor foreefiture of leasehold interests. *See Fifty States Management Corp. v. Pioneer Auto Parks,* 46 N.Y.2d 573, 576–77, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979) (Equity will intervene "to prevent a substantial forfeiture occasioned by a trivial or technical breach."); *Brainerd Manufacturing Co. v. Dewey Garden Lanes, Inc.,* 78 A.D.2d 365, 435 N.Y.S.2d 417 (4th Dep't), *appeal dismissed,* 53 N.Y.2d 701, 439 N.Y.S.2d 109, 421 N.E.2d 504 (1981).

An option to renew is analogous to an executory contract and "at most confers a right to obtain a renewal or extension if there is a compliance with the conditions on which the right is made to depend." *Best Realty Corp. v. Luftig,* 234 N.Y.S.2d 462, 464 (N.Y. City Civ.Ct.1962). Although a right of renewal is entitled to be protected as "something of value," 34 N.Y.Jur. *Landlord and Tenant* § 415 at 266 (1964), the judicial protections against forfeiture, however, will not inure to the tenant's benefit if the tenant has not complied with the conditions for renewal. As one court recently explained, "The refusal to extend results not in a forfeiture for the tenant but only in the loss of the privilege because the conditions precedent to the enjoyment of the privilege have not been met." *Jefpaul Garage Corp. v. Presbyterian Hospi-*

*tal in City of New York,* 61 N.Y.2d 442, 448, 474 N.Y.S.2d 458, 462 N.E.2d 1176 (1984). *See* 34 N.Y.Jur. *Landlord and Tenant* § 418 at 272 (1964).

The debtor's right to renew as described in section 19(b) of the lease is conditional. The specified conditions are that the lessee duly perform and comply with the terms and conditions of the lease. It is a "well-recognized" rule that where a lease expressly provides that a lessee's right to renew the lease depends on the lessee's performance of the covenants and conditions of the lease, the "nonperformance or breach thereof will defeat the [lessee's] right to renew or extend the lease." Annot., 23 A.L.R.4th 908, 912 (1983). Thus, performance and compliance are prerequisites to the debtor's right to renew the lease for an additional five-year term and is "confined strictly to the terms of the lease in respect to the scope of the privilege to renew." *Best Realty Corp., supra,* at 464.

An issue integral to this court's determination of whether or not the debtor duly performed and complied with the lease's requirements concerns the level of performance and compliance required under New York law. The defendant, argues that New York law mandates a strict or literal standard of performance and compliance. The plaintiff claims substantial compliance and performance is the standard in New York.

In this regard, the defendant principally relies on *Jefpaul, supra.* This case, for example, states that the "general rule" is that "if a tenant's right to renew is conditional ... it cannot be exercised validly unless the tenant is in *full compliance* with the conditions [of the lease]." *Jefpaul,* 61 N.Y.2d at 448, 474 N.Y.S.2d 458, 462 N.E.2d 1176 (emphasis added). Curiously, the court in *Jefpaul* distinguished, but did not overrule the holding of another Court of Appeals case principally relied on by the plaintiff, AVA, namely *Atkin's Waste Materials, Inc. v. May,* 34 N.Y.2d 422, 358 N.Y.S.2d 129, 314 N.E.2d 871 (1974). *Jefpaul,* 61 N.Y.2d at 447, 474

N.Y.S.2d 458, 462 N.E.2d 1176 ("Our decision in *Atkin*'s ... does not require a contrary holding."). *Atkin's* holds that a lessee's *substantial compliance* with the terms of its lease is sufficient to warrant the tenant's valid exercise of its renewal option. *Atkin's,* 34 N.Y.2d at 427, 358 N.Y.S.2d 129, 314 N.E.2d 871 ("it may fairly be concluded that *substantial compliance* with the lease is what is required.") (emphasis added).

The court in *Jefpaul* noted in particular that the lessor in *Atkin's* apparently failed (1) to give the tenant adequate, prompt notice of its defaults, (2) to demand that the tenant correct the violations, and (3) to reject promptly the tenant's notice to renew. The other leading cases requiring "strict compliance" cited by both the *Jefpaul* court and by the DOT are *McIntosh v. Rector of St. Phillip's Church,* 120 N.Y. 7, 23 N.E. 984 (1890) and *People's Bank of New York v. Mitchell,* 73 N.Y. 406 (1878). Nevertheless, *Atkin's* appears to illustrate a "tendency" by the New York courts "to overlook a failure to comply strictly with the terms of a contract when the parties by their conduct, have tolerated deviations in performance." *In re Photo Promotion Associates, Inc., supra,* at 882.

In *Vanguard Diversified, Inc. v. The Review Co.,* 35 A.D.2d 102, 313 N.Y.S.2d 269 (2d Dep't 1970) another distinction to the general rule of strict compliance is recognized as well. The tenant in *Vanguard* sought to exercise its renewal option and the landlord opposed claiming the lessee had failed to cure certain violations. The tenant submitted evidence that it was in the process of curing those defaults as of the time when the lease expired. *Vanguard Diversified, Inc.,* 313 N.Y.S.2d at 271. The court found that the general rule of strict performance "is tempered" where the lease requires a continuing performance during its term the quality of which may not be "immediately ascertainable as being full or partial within the framework

of compliance under the circumstances present" at the time when the performance is examined. *Id.* at 272. "Under these circumstances," the court reasoned, "the law does not levy the price of forfeiture, but accedes to the realities. Partial performance tendered in good faith does not detract from the quality of the covenant; it merely means that full performance is in the offing and yet to be made." *Id.* at 273. Where there has been substantial performance by the tenant, the court concluded, the lessee "should not lose all rights of renewal because of the variance from total satisfaction of the covenant." *Id.* at 272.

The views expressed in *Vanguard* and *Atkin's* comport with the general rule of substantial compliance applied by the New York courts to determine the effect of a lessee's default on the landlord's right to terminate the lease. *E.g., W.F.M. Restaurant, Inc. v. Austern,* 35 N.Y.2d 610, 614, 364 N.Y.S.2d 500, 503, 324 N.E.2d 149, 152 (1974) (equity may intervene to prevent a substantial forfeiture despite a "technical breach."); *Liza Co. v. Mark Hellinger Theatre, Inc.,* 19 A.D.2d 288, 240 N.Y.S.2d 1000 (1st Dep't 1963) (technical breach does not constitute default under lease), *aff'd,* 14 N.Y.2d 891, 252 N.Y.S.2d 91, 200 N.E.2d 775 (1964).

Both the debtor and the DOT concede that for nearly four years during which the MTA was the landlord, the debtor performed the services required of a first class fixed-base operator without any default relating to those services. It appears that after the DOT assumed the operation of Stewart from the MTA there were at least five notices of default issued to AVA by the DOT in addition to deficiency notices and less formal notifications of the DOT's displeasure with AVA's performance.[1]

The court also notes that the services required by the lease to be rendered by the debtor are of a continuing nature.

---

1. Although the issue of waiver or estoppel regarding the debtor's *performance defaults* was not raised, the court notes that neither doctrine would be applicable as the record is devoid of any proof that would support a finding that the DOT either waived or is estopped from objecting to the debtor's exercise of its renewal option under the lease.

It would appear to be inequitable to find that a single default by the debtor in derogation of the lease that occurred during the original five-year period of the lease would justify the DOT's denial of any renewal of the lease because of the debtor's failure to comply strictly with the lease. The facts and circumstances of this case as well as equitable considerations amply justify the application of the "substantial performance and compliance standard" in the determination of the debtor's right to renew the lease.

## V. CONCLUSIONS

■ Notwithstanding this court's utilization of a more lenient standard to evaluate the debtor's performance under the lease, the totality of the evidence indicates that the debtor has not substantially performed and complied with the lease's requirements for a first class fixed-base operator for the following reasons.

First, the debtor had adequate notice of DOT's displeasure with its performance in each of the four areas previously analyzed. The debtor received default notices, deficiency letters, and oral complaints from its subtenants concerning the lack of safety, cleanliness, maintenance and promptness of its services. The DOT held monthly conferences with the debtor specifically for the purpose of informing it about the continuing problems of performance. Even over the course of the trial, the debtor was informed through testimony regarding shortcomings in its performance, but the problems persisted nevertheless.

Second, although there was some evidence of the debtor's attempts to effectuate a cure pursuant to section 12(b) of the lease, these efforts did not result in a permanent or lasting remedy of the default. This failure was particularly highlighted in the debtor's housekeeping and maintenance of the leased premises. Practically to the last day of trial, nearly three months after the lease expired, the DOT's representatives testified about the continuing dismal state of cleanliness and substantial lack of repair of the leasehold. The debtor's fail-

ures here clearly contravene the express and unambiguous provisions of the lease obligating the debtor to keep the premises clean and to make the repairs as required by the lease.

A third consideration is the substantiality of the defaults. The debtor's failure to provide the required services promptly violates the lease's main purpose as stated in section seven, subsection (a) of the lease. Plaintiff's Exhibit 1 at 15. The debtor's failure to provide services in a safe manner violates not only section seven of the lease which states the principal purpose of the lease, *id.*, but also the lease's requirement that the lessee dispense fuel "safely" as contained in section one. *Id.* at 4. The preamble to section one specifically states that the lessor entered into the lease agreement with the debtor "for the purpose of conducting the aviation activities specified in section 1 hereof *and for no other purpose whatsoever.*" *Id.* at 1 (emphasis added). The debtor's failure to keep the premises in repair and clean, clearly violates section eight of the lease. In each of these four areas, the debtor violated a fundamental requirement of the lease.

Based upon the complaint and answer, the pre-trial stipulations, the proof adduced at trial and the post-trial memoranda, the debtor-plaintiff's demand for a declaratory judgment that it has the right to renew its lease for an additional five-year term is accordingly denied for failure to sustain its burden of proof that it has duly performed and has been in compliance with the terms and conditions of the lease.

An appropriate Order shall enter in conformity herewith.